AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
05/03/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___AP___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
05/03/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: ___DC___ DEPUTY

United States of America

v.

Leo Vincelette Oladimu,
    aka Leonard James Felton,
    aka Leo Felton,

Defendant

Case No. 5:24-mj-00203

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of April 28, 2024, in the county of San Bernardino in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1

/s/
_____
Complainant's signature

Eric Johnson, FBI Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 5/3/24

_____
Judge's signature

City and state: Riverside, California

Hon. Shashi H. Kewalramani, U.S. Magistrate Judge
Printed name and title

AUSA: Anna P. Boylan (213-894-2170)

**AFFIDAVIT**

I, Eric T. Johnson, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since July 2017. I am currently assigned to the Los Angeles Field Office, Riverside Resident Agency, Domestic and International Terrorism Squad, as part of the Inland Empire Joint Terrorism Task Force. In this capacity, I investigate, among other things, criminal violations concerning domestic and international terrorism, as well as other violations in Title 18 of the United States Code. I have received specialized training in conducting criminal and counter-terrorism investigations and have consulted with my colleagues who have many years of experience investigating criminal and terrorism crimes.

2. I have received 21 weeks (approximately 840 hours) of instruction in the fundamentals of law, ethics, behavioral science, interviewing, report writing, firearms, surveillance, defensive tactics, and case management at the FBI Academy in Quantico, Virginia.

3. As an FBI SA, I have participated in investigations of domestic and international terrorism, fugitive apprehension, arsonist apprehension, child pornography investigations, and investigations that have involved court-authorized interception of wire and electronic communications.

4. I am also a certified International Firearms Specialist, from which I have gained specialized training on firearms and ammunition, to include: classification, safety, nomenclature, markings, mechanical operation, cycle of operation, interstate nexus, curios and relics, destructive devices, short barreled shotguns/rifles, National Firearms Act, silencers, machineguns, and clandestine conversions.

5. I am also an Operator on the FBI Los Angeles Special Weapons and Tactics team, from which I gained additional knowledge to the inner workings, mechanics, and appearance of firearms, as well as ammunition.

6. As a SA, I am authorized to investigate violations of laws of the United States and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

## II. **PURPOSE OF AFFIDAVIT**

7. This affidavit is made in support of a criminal complaint against and arrest warrant for, Leo Vincelette Oladimu, also known as ("aka") Leonard James Felton, aka Leo Felton ("OLADIMU"), for a violation of Title 18, United States Code, Section 922(g)(1) (Felon in Possession of a Firearm).

8. This affidavit is also made in support of search warrants for: (1) 5055 Little Road, Twentynine Palms, California 92277 (the "SUBJECT PREMISES"), as described in Attachment A-1; and (2) the person of OLADIMU, as described in Attachment A-2, for the items to be seized as described below and in Attachment B.

9. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

### III. **PREMISES AND PERSON TO BE SEARCHED**

10. The premises to be searched is the SUBJECT PREMISES, as described in Attachment A-1, which is incorporated herein by reference.

11. The person to be searched is OLADIMU, as described in Attachment A-2, which is incorporated herein by reference.

### IV. **ITEMS TO BE SEIZED**

12. The items to be seized are the evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 922(g)(1) (Felon in Possession of a Firearm and Ammunition) and Section 922(k) (Possession of a Firearm with a Serial Number Removed, Obliterated, or Altered) and Title 26, United States Code, Sections 5861(c) (Possession of a Short-Barreled Shotgun), (f) (Make a Short-Barreled Shotgun), (g) (Obliterate, Remove, Change, or Alter a Serial Number on a Firearm), and (h)(Possession of a Firearm with a Serial Number Obliterated, Removed, Changed, or Altered) (the "Subject

3

Offenses"), as described in Attachment B, which is incorporated herein by reference.

## V. SUMMARY OF PROBABLE CAUSE

13. On Sunday, April 28, 2024, deputies with the San Bernardino County Sheriff's Office ("SBSO") responded to the area of Twentynine Palms, California, in San Bernardino County within the Central District of California, due to multiple callers stating gunshots were heard in the area. Upon arrival, and as seen on the deputy's body worn camera, OLADIMU was walking down the street holding a firearm. It was later determined that OLADIMU possessed a loaded short-barreled shotgun with an obliterated serial number. Based on my review of criminal records and court documents, I know that OLADIMU is a convicted felon and prohibited from possessing a firearm and ammunition. Additionally, OLADIMU knew he was prohibited from possessing a firearm because he has two prior convictions under 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm.

## VI. STATEMENT OF PROBABLE CAUSE

14. Based on my review of law enforcement reports, footage of law enforcement officers' body worn cameras, conversations with other law enforcement officers and agents, and my own knowledge of the investigation, I am aware of the following:

### A. San Bernardino Sheriff's Deputies Response to Calls of Gunshots and See OLADIMU Holding a Shotgun

15. On April 28, 2024, at approximately 8:52 p.m., San Bernardino Sheriff's deputies, who were in full uniform and in

marked SBSO patrol vehicles, responded to the area of Wash Road and Little Road in Twentynine Palms, California due to multiple callers stating gunshots were heard in the area.

16.  As the responding deputies arrived in the area, one deputy observed a flashlight on Little Road.  The deputy turned on the marked vehicle's spotlight and observed an adult male (later identified as OLADIMU) walking northbound on Little Road with a flashlight in one hand and a firearm in his other hand (as seen in the below screenshot from one of the deputies' body worn videos).



17.  According to the SBSO deputies, the firearm appeared black in color and appeared to be a shotgun due to the type of barrel and fore-end.  The deputy got out of the marked patrol vehicle and ordered OLADIMU to drop the firearm and flashlight, to which OLADIMU complied.

18.  As heard on the body worn videos, OLADIMU told the deputies that he had gotten a call from a neighbor about gunshots being heard and that was the reason he was outside with

5

the firearm.  The deputies then detained OLADIMU.  Based on my review of the SBSO's deputies' body worn footage, when asked "whose gun is this," OLADIMU stated, "it's ours."  Based on my review of the body worn videos and discussions with law enforcement officers, I believe what he meant by "it's ours" is that he was referring to him and his wife.

    **B.    OLADIMU Possessed a Loaded Shotgun with an Obliterated Serial Number**

19.  Upon further investigation of the firearm by the responding deputies, the firearm (as seen in the below photograph) was identified as being a matte black Mossberg 590 12-gauge short-barreled shotgun with a fourteen-inch barrel and total length of 27-inches.  The serial number on the shotgun was obliterated (as seen in the below photograph) and the deputies were unable to verify the original owner of the shotgun.  The shotgun had a spent shell casing in the receiver and four live buckshot shotgun shells in the magazine of the shotgun.





### C. OLADIMU Arrested

20. OLADIMU was then arrested pursuant to California Penal Code 33125 (Possession of a Short-Barreled Shotgun) and California Penal Code 23900 (Altered or Removed Firearm's Serial Number). SBSO booked the firearm, four live shotgun rounds, and one spent shotgun round found with OLADIMU into evidence.

21. While being booked at SBSO, subsequent to OLADIMU's arrest, SBSO fingerprinted OLADIMU and identified that he had a previous name of Leonard James Felton. Subsequent record-checks based on his fingerprints and both names identified him as a convicted felon. Upon identifying this information, SBSO charged OLADIMU additionally with California Penal Code 29800 (Felon in Possession of a Firearm) and California Penal Code 30305 (Felon in Possession of Ammunition).

22. Based on my review of the San Bernardino Sheriff's Office Inmate Locator website, OLADIMU was subsequently released on bail on April 30, 2024.

### D. OLADIMU is a Felon with at least 15 Prior Felonies

23. I reviewed OLADIMU's record of arrest, criminal history records, and court documents, and I learned OLADIMU was previously convicted of at least the following felony crimes punishable by a term of imprisonment exceeding one year:

    a. On or about July 17, 1991, OLADIMU was convicted of First Degree Assault, in violation of New York Penal Law § 120.10(1), in the Supreme Court, New York County.

7

   b. In 1994, OLADIMU was convicted of Second Degree Assault, in violation of New York Penal Law § 120.05(7), in the Supreme Court, New York County.

   c. In 1994, OLADIMU was convicted of Aggravated Assault, in violation of New Jersey Stat. Ann. § 2C:12-1b(1), in New Jersey State Court, Middlesex County.

   d. In 1994, OLADIMU was convicted of Second Degree Burglary, in violation of New Jersey Stat. Ann. § 2C:18-1, in New Jersey State Court.

   e. On or about July 26, 2002, a jury found OLADIMU guilty of the following eleven crimes, in the United States District Court, District of Massachusetts, Case No. 1:01-CR-10198-IT, and the Court later sentenced OLADIMU to a total of 262 months' imprisonment followed by a term of three years of supervised release:[1]

    i. Conspiracy to Make and Possess an Unregistered Destructive Device, in violation of Title 18, United States Code, Section 371;

    ii. Receipt of Explosives with Intent to Kill or Injure Persons or Damage Property, in violation of Title 18, United States Code, Section 844(d);

---

[1] OLADIMU was subsequently resentenced in 2006 to 322 months' imprisonment followed by a term of years' supervised release (Case No. 1:01-CR-10198-IT, Dkt. 306, Am. Judgment & Commitment), and again resentenced in 2020 to 252 months' imprisonment followed by a term of three years' supervised release (Id., Dkt. 431, Resent. Trans. at 90).

     iii. Possession of a Firearm During and in Relation to a Crime of Violence, in violation of Title 18, United States Code, Section 924(c);

     iv. Being a Felon in Possession of Firearm, namely an Iberia Model 40 Smith & Wesson Semi-Automatic Pistol, Bearing Serial Number 130358, in violation of Title 18, United States Code, Section 922(g)(1);

     v. Being a Felon in Possession of Firearm, namely a Smith & Wesson Model 642, .38 caliber Revolver, Bearing Serial Number CAT 6034, in violation of Title 18, United States Code, Section 922(g)(1);

     vi. Conspiracy to Make and Pass Counterfeit Federal Reserve Notes, in violation of Title 18, United States Code, Section 371;

     vii. Making Counterfeit Federal Reserve Notes, in violation of Title 18, United States Code, Section 471;

     viii. Conspiracy to Obstruct Justice, in violation of Title 18, United States Code, Section 371;

     ix. Obstruction of Justice, in violation of Title 18, United States Code, Section 1512(b)(2)(B);

     x. Conspiracy to Commit Bank Robbery and/or to Interfere with Commerce by Robbery, in violation of Title 18, United States Code, Section 371; and

     xi. Bank Robbery, in violation of Title 18, United States Code, Section 2113(a).

   f. Based on my review of court documents, the charging documents for the above federal convictions alleged

that OLADIMU and his co-defendant (now wife) conspired to construct, make, and possess a bomb for use in blowing up Jewish and/or African-American memorials. (Case No. 1:01-CR-10198-IT, Dkt. 33, Second Superseding Indictment.)

### E. OLADIMU Knew he was Prohibited from Possessing a Firearm and Knew he was a Convicted Felon

24. Based on my review of OLADIMU's criminal history records and court documents, I know the following:

    a. Based on my review of OLADIMU's 2002 sentencing memorandum and sentencing hearing transcript, as well as the U.S. District Court of Massachusetts's 2020 order granting OLADIMU's petition for habeas corpus under 28 U.S.C. § 2255, OLADIMU admitted through counsel in a written filing to the following four prior felonies being crimes of violence qualifying him as a career offender and armed career criminal: 1991 New York assault, 1994 New York assault, 1994 New Jersey assault, and 1994 New Jersey burglary. (Case No. 1:01-CR-10198-IT, Dkt. 224 Def. Sent. Mem. at 8-9; see also id., Dkt. 301 Sent. Trans. at 19-21; id., Dkt. 413, Order Granting Def. Pet. For Writ of Habeas Corpus under 28 U.S.C. § 2255, at 8-21.)

    b. As stated above, two of OLADIMU's 11 federal convictions following the 2002 jury trial included two counts of being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1), in the United States District Court, District of Massachusetts, Case No. 1:01-CR-10198-IT. These two counts were based on OLADIMU possessing two different guns following his prior state felony convictions for

a 1991 New York assault, 1994 New York assault, 1994 New Jersey assault, and 1994 New Jersey burglary felony convictions.

### F.    Interstate Nexus

25.  On May 2, 2024, I, as an FBI International Firearms Specialist, examined the Mossberg 590 12-gauge short-barreled shotgun that OLADIMU possessed on April 28, 2024, and confirmed that it was manufactured by Mossberg in Connecticut, Texas, or internationally.  I also examined the five rounds of 12-gauge shotgun ammunition that OLADIMU possessed on April 28, 2024, and confirmed that the ammunition was manufactured by Saga internationally.  Because the firearm and ammunition were manufactured outside of the State of California and found in California, I believe that they traveled in and affected interstate commerce.

### G.    There is Probable Cause to Believe that Evidence of the SUBJECT OFFENSES Will Be Found at the SUBJECT PREMISES and on OLADIMU's Person

26.  From my training, personal experience conducting firearms investigations, and the collective experiences related to me by other law enforcement officers who also conduct firearms investigations, I am aware of the following:

   a.   Persons who illegally possess, purchase, or sell firearms, including short-barreled shotguns, often store firearms, ammunition, firearm-related items, and evidence of possession and sale on their person, in their residence, on their property, and in vehicles that they control.

   b.   Persons who illegally possess, purchase, or sell firearms generally maintain records of their firearm

11

transactions as items of value and usually keep them in their residence, on their property, in their vehicles, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms, ammunition, and firearm parts and accessories to prohibited individuals or other individuals involved in criminal activities for future sales, purchases, or referrals. Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

      c.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications. These may include recordings or photographs that may reveal both that a person has possessed a particular firearm or ammunition (e.g., photographs of them holding a particular firearm) and also that person's knowledge of the firearm's characteristics and functionalities (e.g., videos of them removing serial numbers or sawing off the barrel of a shotgun). Digital devices containing such evidence are often kept on the person.

      d.  Those who illegally possess firearms and ammunition often sell their firearms and purchase firearms and ammunition. Correspondence between persons buying and selling firearms or ammunition often occurs over phone calls, e-mail,

12

text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale or possession of firearms or ammunition to have photographs of firearms or ammunition they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.  These communications may include information or references that tend to establish a person's knowledge of a firearm's characteristics and functionalities (e.g., text or social-media messages describing whether a firearm is semi-automatic or equipped with a device that renders it capable of fully automatic fire).  Digital devices containing such evidence are often kept on the person.

        e.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices to conceal their identities when engaging in firearms transactions and to make detection and identification by law enforcement more difficult.  Individuals engaged in such illegal firearms transactions often carry one or more digital devices

with them so that they are able to stay in frequent communication with potential suppliers or customers.

   f. Individuals engaged in possessing or making altered firearms, including short-barreled firearms and firearms with altered or obliterated serial numbers, often maintain tools, materials, or information that enable, facilitate, and assist in altering the firearms.  Such tools are often kept in residences, sheds, garages, and vehicles.  Such information related to possessing or making altered firearms are often kept on digital devices.

  27. Based on all the above facts, I submit that there is probable cause to believe that evidence of the SUBJECT OFFENSES will be found at the SUBJECT PREMISES and on OLADIMU's person, including in vehicles and in digital devices.  For example, text messages, social-media messages, and/or photographs on any digital devices on OLADIMU's person may tend to show that OLADIMU unlawfully possessed the short-barreled shotgun with no serial number found on his person when SBSO deputies first encountered OLADIMU.

### VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

  28. Based on my training, experience, and information from

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

29.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

      a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult

16

to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

       b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    30.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

       a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

       b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

   c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress OLADIMU's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of OLADIMU's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VIII. CONCLUSION

31. For all the reasons described above, there is probable cause to believe that OLADIMU violated Title 18, United States Code, Section 922(g)(1) (Felon in Possession of a Firearm).

32. Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES will be found in the SUBJECT PREMISES and on OLADIMU's person, as described in Attachments A-1 and A-2, respectively.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __3rd__ day of
__May_____, 2024.

_____
HONORABLE SHASHI H. KEWALRAMANI
UNITED STATES MAGISTRATE JUDGE